# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROGER A. HORNBROOK, ) | |
| ) | |
| Plaintiff, ) | C.A. No. 09-40 Erie |
| ) | |
| v. ) | District Judge McLaughlin |
| ) | Chief Magistrate Judge Baxter |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.    RECOMMENDATION**

It is respectfully recommended that the Defendant's Motion for Summary Judgment (*Document No. 11*) be denied, and that the Plaintiff's Motion for Summary Judgment (*Document No. 9*) be denied to the extent that it requests an award of benefits but granted to the extent that it seeks a vacatur of the administrative decision of the Commissioner of Social Security ("Commissioner"), and a remand for further administrative proceedings.

**II.   REPORT**

**A.    Procedural History**

Plaintiff Roger A. Hornbrook ("Hornbrook") commenced this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the Commissioner's decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act") [42 U.S.C. §§ 401-433, 1381-1383f]. Hornbrook protectively applied for DIB and SSI benefits on December 7, 2004, alleging disability as of May 30, 1992.[1]  (Tr. 98, 116, 616).  The applications were

---

[1] In his opinion, the ALJ referred to December 7, 2004, as Hornbrook's filing date and November 29, 2004, as his protective filing date. (Tr. 12, 14).  Since the record indicates that Hornbrook applied for DIB and SSI benefits on December 20, 2004, it must be assumed that December 7, 2004, was his protective filing date. (Tr. 98, 116, 616).  The ALJ's reason for identifying November 29, 2004, as Hornbrook's protective filing date is unclear. (Tr. 14).  In any event, this discrepancy is inconsequential.

1

administratively denied on April 27, 2005. (Tr. 83, 609). Hornbrook responded on June 2, 2005, by filing a timely request for an administrative hearing. (Tr. 77). On August 3, 2007, a hearing was held in Erie, Pennsylvania, before Administrative Law Judge William Kenworthy (the "ALJ"). (Tr. 34). Hornbrook, who was represented by counsel, appeared and testified at the hearing. (Tr. 39-59). Testimony was also taken from Karen Krull ("Krull"), an impartial vocational expert. (Tr. 59-62). In a decision dated August 22, 2007, the ALJ determined that Hornbrook was not "disabled" within the meaning of the Act. (Tr. 9-21). The Appeals Council denied Hornbrook's request for review on December 24, 2008, thereby making the ALJ's decision the final decision of the Commissioner in this case. (Tr. 5). This action was commenced by Hornbrook on February 23, 2009. (Doc. No. 1). Hornbrook and the Commissioner filed motions for summary judgment on September 17, 2009, and October 19, 2009, respectively. (Doc. Nos. 9 & 11). These motions are the subject of this report and recommendation.

  B. **Standard of Review**

  This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565,108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks and citation omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the

3

claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

### C. The ALJ's Decision

Although Hornbrook had engaged in substantial gainful activity subsequent to his alleged onset date, the ALJ determined that such work activity had preceded Hornbrook's protective filing date. (Tr. 14). Hornbrook was found to be suffering from the residual effects of a traumatic injury to his right hip, status post total hip arthroplasty, degenerative disc disease, and a bipolar disorder. (Tr. 15). Although these impairments were deemed to be "severe" within the meaning of 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii), the ALJ concluded that they did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listing of Impairments" or, with respect to a single impairment, a "Listed Impairment" or "Listing"). (Tr. 15-17).

In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ assessed Hornbrook's

4

residual functional capacity as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work with a sit/stand option at intervals of about 20 minutes, limited to the performance of simple, routine tasks.

(Tr. 17). Hornbrook had past relevant work experience as a factory laborer and painter. Krull testified that these jobs were classified at the "medium" level of exertion.[2] (Tr. 60). It was determined that Hornbrook could not return to his past relevant work, since he was deemed to be incapable of performing work above the "sedentary" level of exertion.[3] Hornbrook was born on July 3, 1964, making him forty years old as of his application date and forty-two years old as of the date of the ALJ's decision. (Tr. 19, 98). He was classified as a "younger person" under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c). He had the equivalent of a high school education and an ability to communicate in English.[4] (Tr. 19). Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Hornbrook could work as an alarm monitor, an assembler, or a cashier. (Tr. 20). Krull's testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). (Tr. 60).

**D.  Background**

Hornbrook's right hip impairment is the result of a motorcycle accident that occurred on May 29, 1992. (Tr. 43). According to Hornbrook, the accident "sheared the ball" of his hip "off

---

[2]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

[3]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

[4]The record indicates that Hornbrook received a General Education Diploma ("GED") while serving a prison sentence. (Tr. 321). Hornbrook testified that he had been incarcerated in New Hampshire for operating a motor vehicle without a valid driver's license, and that he had been released from custody on November 10, 2001. (Tr. 39). Dr. Julie Greissinger, a treating physician, indicated on two separate occasions that Hornbrook had served four years in a North Carolina prison for driving without a license. (Tr. 320, 328). It is not clear whether Hornbrook served terms of incarceration in both New Hampshire and North Carolina, or whether Dr. Greissinger mistakenly referenced North Carolina instead of New Hampshire.

5

on an angle." (Tr. 43). On June 18, 1992, he underwent Open Reduction Internal Fixation ("ORIF") surgery on his hip. (Tr. 298). Additional operations were performed in 1993. (Tr. 283-301). Hornbrook underwent a total right hip arthroplasty (i.e., a hip replacement) on December 14, 1993. (Tr. 44, 519). The procedure was performed by Dr. Kevin M. Coughlin, who was affiliated with Finger Lakes Orthopedics in Elmira, New York. (Tr. 43). Dr. Coughlin warned Hornbrook that his hip surgery would most likely "require revision down the road." (Tr. 287).

As of March 13, 2005, Hornbrook's right hip was causing him constant pain. (Tr. 519). It was recommended that he undergo a "revision" of his hip replacement. (Tr. 520). On September 26, 2005, the surgery was performed by Dr. Mark D. Suprock at the Hamot Medical Center in Erie, Pennsylvania. (Tr. 549-552). Nevertheless, Hornbrook continued to suffer from hip pain subsequent to the operation. (Tr. 474, 594).

Hornbrook's degenerative disc disease was diagnosed as a result of a magnetic resonance imaging ("MRI") scan of his lumbar spine conducted on April 6, 2006. (Tr. 592). At that time, his back pain extended to his right hip and leg. (Tr. 592). Dr. Paul Carnes administered a series of steroid injections between May 16, 2006, and October 24, 2006, to alleviate Hornbrook's back pain. (Tr. 604-608).

During the second half of 2004, Hornbrook intermittently received detoxification and substance abuse treatment at various treatment centers. (Tr. 15). On November 16, 2004, Hornbrook was voluntarily admitted to Millcreek Community Hospital's Behavioral Care Unit ("Millcreek") pursuant to 50 PA. STAT. § 7201. (Tr. 328). Dr. Julie Greissinger indicated that Hornbrook was suffering from an unspecified mood disorder and an antisocial personality disorder. (Tr. 330). Hornbrook admitted that he had experienced both suicidal and homicidal ideation. (Tr. 330). Nevertheless, he denied that he had actually intended to commit suicide or homicide. (Tr. 345). Dr. Greissinger provided him with prescriptions for Wellbutrin, Trazodone and Zyprexa upon discharge. (Tr. 330).

Hornbrook returned to Millcreek on December 9, 2004, claiming that he had devised a plan to hang himself with a belt. (Tr. 319). Dr. Greissinger determined that Hornbrook was

6

suffering from a bipolar disorder. (Tr. 322). Hornbrook's medications were slightly adjusted before he was discharged. (Tr. 322).

    **E.**    **Discussion**

In support of his motion for summary judgment, Hornbrook advances two alternative arguments. First, he contends that the ALJ erred in determining that his impairments did not meet or medically equal Listings 1.02 and 1.03. (Doc. No. 10 at 12-14). Second, he argues that the ALJ erred in determining that he had the residual functional capacity to perform a limited range of sedentary work. (Doc. No. 10 at 14-16). These issues will be addressed in sequence. Before reaching those issues, however, the Court must address a few preliminary points concerning its scope of review in this proceeding.

The dispositive question in this case is whether the Commissioner's decision denying Hornbrook's applications for DIB and SSI benefits is "supported by substantial evidence." Relevant to the analysis is the first sentence of § 405(g), which provides:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g). As the Supreme Court observed in *Califano v. Sanders*, 430 U.S. 99, 108, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), this statutory provision limits judicial review to a "final decision" which has been "made after a hearing." Because the Act does not define the term "final decision," the SSA is authorized to give meaning to that term through the promulgation of regulations. 42 U.S.C. § 405(a). The Supreme Court has construed the Commissioner's regulations to mean that the term "final decision" refers to either (1) the decision of an administrative law judge denying a claim, where the claimant's request for review has been denied by the Appeals Council, or (2) the decision of the Appeals Council denying a claim, where the claimant's request for review has been granted and the Appeals Council has issued its own decision. *Sims v. Apfel*, 530 U.S. 103, 106-107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000).

In his brief, Hornbrook purports to challenge the Appeals Council's decision denying his

request for review. (Doc. No. 10 at 4). Nevertheless, the Court is statutorily authorized to review only "final decisions" of the Commissioner. 42 U.S.C. § 405(g). "A 'final decision' is a particular type of agency action, and not all agency determinations are final decisions." *Bacon v. Sullivan*, 969 F.2d 1517, 1519 (3d Cir. 1992). The decision of the Appeals Council denying Hornbrook's request for review did not constitute a "final decision" within the meaning of § 405(g). *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). No statute authorizes a court to review a decision of the Appeals Council denying a claimant's request for review. *Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). When the Appeals Council denied Hornbrook's request for review, *the ALJ's decision* became the final decision of the Commissioner in this case. *Sims*, 530 U.S. at 106-107. Therefore, it is *that* decision which is presently before the Court.

The sixth sentence of § 405(g) provides, in pertinent part, that the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). As this language makes clear, the Court is empowered to order the taking of additional evidence before the Commissioner, provided that there is *both* "new evidence which is material" *and* "good cause" for Hornbrook's failure to incorporate such evidence into the record during the course of the prior administrative proceedings. Evidence is "new" if it was not available at the time of the administrative proceedings, and if it is not merely cumulative of preexisting evidence. *Szubak v. Secretary of Health & Human Services*, 745 F.2d 831, 833 (3d Cir. 1984). Evidence is "material" if (1) it relates "to the time period for which benefits were denied" and (2) there is a reasonable probability that the Commissioner's decision would have been different had it been considered. *Kelley v. Commissioner of Social Security*, 566 F.3d 347, 351, n. 11 (3d Cir. 2009); *Jens v. Barnhart*, 347 F.3d 209, 214 (7th Cir. 2003); *Szubak*, 745 F.2d at 833.

The Commissioner's regulations permit a claimant to submit "new and material evidence" to the Appeals Council in connection with a request for review. 20 C.F.R. §§ 404.970(b), 416.1470(b). The regulations direct the Appeals Council to consider such evidence in determining whether to review a decision rendered by an administrative law judge. *Id.* Where

a request for review is granted and the Appeals Council proceeds to independently issue a decision denying a claimant's application for benefits, the decision of the Appeals Council constitutes the "final decision" of the Commissioner and is *itself* subject to judicial review. *Eads v. Secretary of the Dept. of Health & Human Services*, 983 F.2d 815, 817 (7th Cir. 1993). In that situation, a reviewing court can consider all of the evidence contained in the administrative record (including the "new and material evidence" that was never presented to the administrative law judge) in determining whether the Commissioner's final decision is "supported by substantial evidence." *Id.* Where the Appeals Council denies a claimant's request for review and never issues its own merits-based decision, the decision of the administrative law judge becomes the "final decision" of the Commissioner that is subject to judicial review. *Sims*, 530 U.S. at 106-107. In that scenario, a reviewing court can consider only the evidence that was before the administrative law judge at the time of his or her decision in determining whether *that* decision (i.e., the Commissioner's "final decision") is "supported by substantial evidence," and the evidence first presented to the Appeals Council can be considered *solely* for the purpose of determining whether a sentence-six remand is appropriate.[5] *Matthews*, 239 F.3d at 593-595. By the plain terms of the statute, a sentence-six remand is proper only where, *inter alia*, the claimant can show that he or she had "good cause" for not submitting the relevant evidence to the administrative law judge at a time when it could have been considered. 42 U.S.C. § 405(g).

---

[5]This issue has divided the federal Courts of Appeals. Compare *Ingram v. Commissioner of Social Security*, 496 F.3d 1253, 1262-1267 (11th Cir. 2007), *Higginbotham v. Barnhart*, 405 F. 3d 332, 336-337 (5th Cir. 2005), *Perez v. Chater*, 77 F. 3d 41, 45 (2nd Cir. 1996), *O'Dell v. Shalala*, 44 F. 3d 855, 859 (10th Cir. 1994), *Ramirez v. Shalala*, 8 F. 3d 1449, 1452 (9th Cir. 1993), *Nelson v. Sullivan*, 966 F. 2d 363, 366 (8th Cir. 1992), and *Wilkins v. Secretary of DHHS*, 953 F. 2d 93, 96 (4th Cir. 1991) (en banc), (holding that evidence not submitted to the administrative law judge but subsequently submitted to the Appeals Council, which later denies review, should be considered by the District Court), with *Matthews v. Apfel*, 239 F. 3d 589, 593-594 (3rd Cir. 2001), *Cotton v. Sullivan*, 2 F. 3d 692, 695-696 (6th Cir. 1993), and *Eads v. Secretary of DHHS*, 983 F. 2d 815, 817-818 (7th Cir. 1993), (holding that evidence not presented to the administrative law judge but subsequently submitted to the Appeals Council, which later denies review, should not be considered by the District Court unless the claimant shows "good cause" for not having submitted the evidence to the administrative law judge). See also *Mills v. Apfel*, 244 F. 3d 1, 4-6 (1st Cir. 2001), (holding that an administrative law judge cannot be faulted for failing to consider unavailable evidence, but that the Appeals Council's denial of a request for review may be judicially reviewable where the Appeals Council relies on an "egregiously mistaken ground" for its action). This Court's reasoning is consistent with the decision of the United States Court of Appeals for the Third Circuit in *Matthews v. Apfel*, 239 F.3d 589 (3d Cir. 2001).

Attached to Hornbrook's brief are records from Stairways Behavioral Health ("Stairways") concerning Hornbrook's treatment between March 29, 2005, and February 1, 2007. (Doc. Nos. (10-1)-(10-21)). The Commissioner argues that such records cannot be considered at this stage because they are not "material," and because Hornbrook cannot establish "good cause" for failing to present them to the ALJ. (Doc. No. 12 at 22-27). Hornbrook contends that the records from Stairways were submitted to the ALJ, but that they "apparently were not included in the final record." (Doc. No. 10 at 15). The Court understands Hornbrook's position to be that this evidence *was* available to the ALJ, but that it was not considered because of an oversight attributable to the Commissioner.

The hearing transcript indicates that the ALJ left the record open for an additional two weeks so that Hornbrook could obtain and submit documentary evidence in the possession of Dr. Carnes. (Tr. 37). The evidence concerning Hornbrook's steroid injections was submitted to the ALJ subsequent to the hearing. (Tr. 4). The record is silent as to whether the records from Stairways were actually submitted to the ALJ prior to the issuance of his decision. Since the hearing was held on August 3, 2007, the record would have closed on August 17, 2007. (Tr. 34, 37). The ALJ issued his decision denying Hornbrooks applications on August 22, 2007. (Tr. 9-21). In a letter to the ALJ dated August 16, 2007, Hornbrook's counsel specifically referenced the submission of documentary evidence which had been supplied by Dr. Carnes. (Tr. 602-603). The letter also contained a reference to Hornbrook's bipolar disorder supported by a parenthetical citation reading, "Stairways records 3/29/05 thru 2/1/07 submitted at hearing." (Tr. 603). This citation indicates that Hornbrook's counsel subjectively believed that the records from Stairways had been submitted at the hearing, and that he believed them to be properly before the ALJ, even if that was not actually true.[6]

---

[6]The Court is unmoved by the Commissioner's argument concerning the failure of Hornbrook's counsel to raise an objection at the hearing when the ALJ admitted evidence into the record. (Doc. No. 12 at 26). If Hornbrook is correct, and the records from Stairways were actually submitted to the ALJ at the hearing, there was no reason for his counsel to object. If the Commissioner is correct, and the records were not actually submitted at the hearing, there was still no reason for Hornbrook's counsel to object to the admission of the records that were being admitted by the ALJ. (Tr. 37). Moreover, if Hornbrook's counsel subjectively believed that the records from Stairways were being admitted, he was not in a position to point out the absence of those records even if, in reality, they were not

Even if it is assumed that Hornbrook can establish "good cause" for the absence of the disputed records from the administrative transcript (i.e., an error or oversight attributable to the Commissioner), the Commissioner argues that the records are not "material" in any event. (Doc. No. 12 at 24-25). Under the present circumstances, however, the Court need not determine whether a sentence-six remand is appropriate. A careful review of the evidence that was indisputably before the ALJ reveals that the Commissioner's decision denying Hornbrook's applications for DIB and SSI benefits is not "supported by substantial evidence," and that a remand for further administrative proceedings is warranted under the fourth sentence of § 405(g).[7] Since a remand is called for even if the records from Stairways are not considered, the "good cause" and "materiality" inquiries are inconsequential. It suffices to say that these records should be considered by the Commissioner on remand. *Reefer v. Barnhart*, 326 F.3d 376, 381 (3d Cir. 2003).

Hornbrook argues that the ALJ erred in determining that his impairments did not meet or medically equal Listings 1.02 and 1.03. (Doc. No. 10 at 12-14). The Listing of Impairments describes impairments which preclude an individual from engaging in substantial gainful activity without regard to his or her age, education, or past work experience. *Knepp v. Apfel*, 204 F.3d 78, 85 (3d Cir. 2000). In order to qualify as *per se* disabled at the third step of the sequential evaluation process, a claimant must show that his or her impairment (or combination of impairments) either "matches" a Listing or is "equivalent" to a Listing. *Sullivan v. Zebley*, 493

---

actually being admitted. In any event, the failure of Hornbrook's counsel to raise an objection at the hearing concerning the ALJ's admission of evidence (or failure to admit evidence) creates no inference that Hornbrook's contention is lacking in credibility. Equally unavailing is the Commissioner's argument concerning the failure of Hornbrook's counsel to submit the records from Stairways to the Appeals Council in support of Hornbrook's request for review. (Doc. No. 12 at 26-27). If Hornbrook's counsel believed that the records were already a part of the administrative record, he would have had no reason to submit them to the Appeals Council separately. The Commissioner filed the administrative transcript with this Court on June 24, 2009. (Doc. No. 5). The records from Stairways were not submitted to this Court until September 17, 2009, when Hornbrook filed his brief. (Doc. No. 10). It may be that Hornbrook's counsel did not learn that the records were missing until after the administrative transcript had already been filed.

[7]The fourth sentence of § 405(g) provides the Court with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

11

U.S. 521, 530-531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). An impairment "matches" a Listing only if it satisfies *all* of the relevant medical criteria. *Id.* at 530. An impairment is "equivalent" to a Listed Impairment only where it is supported by medical findings equal in severity to *all* of the criteria applicable to the most similar Listing. *Id.* at 531. The burden is on the claimant to present evidence in support of his or her allegation of *per se* disability. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992).

> The language contained in Listings 1.02 and 1.03 provides:
>
> 1.02 *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints.
> With:
>     A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
> or
>     B. Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.
> 1.03 *Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint*, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 1.02 & 1.03 (emphasis in original). Hornbrooks impairments impact his lower extremities rather than his upper extremities. Therefore, the Court does not understand him to argue that he cannot "perform fine and gross movements effectively." Instead, he contends that effective ambulation is precluded by the severity of his impairments. (Doc. No. 10 at 12-14). The language contained in Listing 1.00B2b, which is incorporated by reference within Listings 1.02 and 1.03, provides:

> b. *What We Mean by Inability To Ambulate Effectively*
> (1) *Definition*. Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

12

> (2) *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.00B2b (emphasis in original).

In his opinion, the ALJ determined that Hornbrook's impairments did not meet or medically equal Listing 1.03 because physical therapy records indicated that Hornbrook had been "walking with a normal gait" by March 26, 2006, which was only six months after his hip surgery of September 26, 2005. (Tr. 16). The ALJ concluded that since Hornbrook's alleged inability to ambulate had not lasted for longer than six months, the twelve-month durational requirement of Listing 1.03 had not been satisfied. (Tr. 16). Hornbrook takes issue with this finding by contending that, after his motorcycle accident, he had been unable to ambulate effectively for the requisite twelve-month period. (Doc. No. 10 at 13-14). The motorcycle accident, however, occurred in 1992. (Tr. 43). That is not the period of time at issue in this case. The record indicates that Hornbrook received benefits under Title II at some point after his accident, and that such benefits continued until December 16, 2004. (Tr. 12). The benefits were apparently terminated because Hornbrook had started to engage in substantial gainful activity.[8] (Tr. 12). The decision terminating Hornbrook's benefits as of December 16, 2004, has not been reopened. (Tr. 12). For this reason, Hornbrook's alleged inability to ambulate for a full year after his 1992 accident is inconsequential.

Hornbrook relies on his testimony at the hearing to establish that he remains unable to ambulate effectively. (Doc. No. 10 at 13). At the hearing, Hornbrook testified that he could

---

[8]The circumstances surrounding Hornbrook's prior receipt of benefits are not included within the documentary record. At the hearing, Hornbrook's counsel stated that he knew nothing about the termination decision. (Tr. 36-37). Hornbrook's counsel conceded that there was no basis for reopening that decision. (Tr. 37).

13

walk approximately one block *without* a cane, and approximately two blocks *with* a cane. (Tr. 53). If Hornbrook needed to use *two canes*, he would be able to establish that he is *per se* disabled. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.00B2b(2). The Commissioner's regulations define the term "ineffective ambulation" to mean an inability to ambulate "without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.00B2b(1)(emphasis added). Because a single cane occupies only one upper extremity, its use does not satisfy the "ineffective ambulation" criteria for Listings 1.02 and 1.03. "Substantial evidence" supports the ALJ's determination that Hornbrook was not *per se* disabled at the third step of the sequential evaluation process. (Tr. 16-17).

Hornbrook alternatively argues that the ALJ erred in determining that he had the residual functional capacity to perform a limited range of sedentary work. (Doc. No. 10 at 14-17). This argument is based primarily on the findings of Dr. Gary E. Pasqualicchio, who performed a consultative physical examination of Hornbrook on April 13, 2005. (Tr. 436-439). Dr. Pasqualicchio reported that Hornbrook had experienced some difficulty in getting onto the examination table. (Tr. 438). Dr. Pasqualicchio observed that Hornbrook had "foot drop involving his right foot," which precluded him from "walking on his heels." (Tr. 438). The examination revealed that Hornbrook had "right lower extremity weakness." (Tr. 438). Under the heading "medical source exam," Dr. Pasqualicchio stated as follows:

> He can lift 10 pounds occasionally and carry 10 pounds. He can stand for less than an hour but must sit due to leg pain and lumbar pain. He can sit for probably one to two hours. Pushing and pulling probably can be done with his hands but his right lower extremity is actually useless in any of these activities. He is not capable of bending, kneeling, stooping, crouching, balancing, occasional climbing, [sic] now its occasional but this would be difficult for him to perform.

(Tr. 438-439). Dr. Pasqualicchio further declared that Hornbrook's "other physical functions" were "normal," and that he had no "environmental restrictions." (Tr. 439).

The ALJ concluded that Hornbrook had the residual functional capacity to engage in a range of sedentary work which could be performed with a sit/stand option at twenty-minute intervals, and which involved the performance of only simple, routine tasks. (Tr. 17). Krull

14

testified that an individual with such a residual functional capacity could work as an alarm monitor, an assembler, or a cashier. (Tr. 60). In response to a question posed by Hornbrook's counsel, Krull stated that an individual working in one of these positions would not be able to sit or stand at will. (Tr. 61).

On April 22, 2005, Dr. Frank Bryan, a nonexamining medical consultant, opined that Hornbrook could engage in a range of "light work" that involved only occasional climbing, kneeling, and crawling.[9] (Tr. 440-446). Dr. Bryan recognized that his consultative assessment was at odds with Dr. Pasqualicchio's examination report. (Tr. 444). Nevertheless, he accorded Dr. Pasqualicchio's findings "little weight" because he believed them to have been based "primarily on [Hornbrook's] representation of his physical capabilities." (Tr. 446).

In determining that Hornbrook could perform a limited range of work at the sedentary level of exertion, the ALJ specifically noted that Dr. Bryan had found Hornbrook to be capable of performing light work. (Tr. 19). Nonetheless, the ALJ did not resolve the tension between Dr. Pasqualicchio's examination report and Dr. Bryan's consultative assessment. Instead, the ALJ simply declared that "no treating or examining physician ha[d] expressed an opinion that [Hornbrook] [wa]s totally disabled." (Tr. 19).

Although the ALJ acted as though the reports supplied by Dr. Pasqualicchio and Dr. Bryan were generally consistent with one another, it is clear from the documentary record that they were not. (Tr. 444-446). Where a conflict between two medical opinions is dispositive, an administrative law judge must explain why one opinion is credited over the other. *Reefer*, 326 F.3d at 382; *Burnett v. Commissioner of Social Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000). It was not permissible for the ALJ to proceed on the erroneous premise that no actual conflict existed. Dr. Pasqualicchio indicated that Hornbrook could "stand for less than one hour" and "sit for probably one to two hours." (Tr. 439). The limitations identified by Dr. Pasqualicchio were

---

[9]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

15

markedly different from the limitations ultimately found by the ALJ. (Tr. 17). An inability to sit for more than two hours is not fully accounted for by an accommodation permitting an individual to alternate between a sitting and standing position at twenty-minute intervals. Indeed, Krull testified that the jobs described by her would not provide for an accommodation permitting an individual to sit or stand at will. (Tr. 61).

At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003)(footnote omitted). In order for a vocational expert's answer to a hypothetical question to constitute "substantial evidence" of the existence of jobs consistent with the claimant's residual functional capacity, the hypothetical question must adequately convey to the vocational expert *all* of the claimant's credibly established limitations. *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir. 2004). If a credibly established limitation is omitted from an administrative law judge's hypothetical question, there is a danger that the vocational expert will identify jobs requiring the performance of tasks that would be precluded by the omitted limitation. *Burns v. Barnhart*, 312 F.3d 113, 122-124 (3d Cir. 2002). An administrative law judge is free to omit a limitation from his or her hypothetical question only where that limitation has not been credibly established. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). Where medical opinions concerning the existence or nonexistence of a particular limitation are in conflict, the administrative law judge must adequately explain why one opinion is credited and the other opinion is discredited. *Fargnoli*, 247 F.3d at 41-44.

In this case, it is entirely possible (and perhaps likely) that Dr. Pasqualicchio's examination findings, if credited, would have warranted a finding that Hornbrook was statutorily disabled.[10] The ALJ appears to have dismissed this possibility by simply declaring that no

---

[10]Krull was never asked whether work existed in the national economy for an individual with the limitations described in Dr. Pasqualicchio's examination report. (Tr. 59-62).

treating or examining physician had opined that Hornbrook was "disabled" within the meaning of the Act. (Tr. 19). The ALJ did not resolve the conflict between the two competing medical reports. Instead, he simply glossed over that conflict and proceeded as if the two medical reports were consistent with one another. It cannot be said that Dr. Pasqualicchio's examination report was so lacking in probative value, or so overwhelmed by competing medical evidence, that the ALJ was free to implicitly reject it without explaining his reasons for doing so. *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 203-205 (3d Cir. 2008). As Hornbrook points out, Dr. Pasqualicchio's examination report is the *only* physical capacity assessment contained in the record that was submitted by an examining physician. (Doc. No. 10 at 14). Consultative examiners often bring a unique blend of impartiality, expertise and objectivity to the adjudicatory process. *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985). At the conclusion of the hearing, Hornbrook's counsel argued that a second consultative examination was warranted, since Dr. Pasqualicchio's examination had been conducted before Hornbrook's surgery of September 26, 2005. (Tr. 62). Although the ALJ indicated that he would give "some further thought" to that request, he apparently decided that a second examination was not necessary. (Tr. 62). While it was the ALJ's prerogative to determine that a second consultative physical examination was unnecessary, he was not free to mischaracterize the examination report that did exist. *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 357 (3d Cir. 2008). Because the ALJ's decision in this case was based primarily on a mischaracterization of a critical medical examination report, that decision is not "supported by substantial evidence."

The only remaining question is whether a judicially-ordered award of benefits is warranted, or whether a remand for further administrative proceedings is the more appropriate remedy. An immediate award of benefits is proper only where the administrative record of a case has been fully developed, and where the record as a whole indicates that the claimant is statutorily disabled. *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000)(citation omitted). That standard is not met here. As Hornbrook's counsel pointed out at the hearing, the record lacks an assessment of Hornbrook's physical capabilities postdating his surgery of September 26, 2005. (Tr. 62). As noted earlier, the ALJ never made findings concerning the reliability of Dr.

17

Pasqualicchio's examination report. (Tr. 19). Moreover, a remand for further administrative proceedings will give the Commissioner a fresh opportunity to consider the impact that Hornbrook's bipolar disorder has on his ability to work. Dr. Glenn Bailey, a consultative medical examiner, opined on March 9, 2005, that Hornbrook's mental impairments had not resulted in any "marked" or "extreme" limitations. (Tr. 412-418). Dr. Bailey's examination findings were buttressed by a similar opinion expressed by Dr. Sharon Becker Tarter, a nonexamining medical consultant, on March 22, 2005. (Tr. 419-435). Although Hornbrook's mental impairments may not have been disabling in and of themselves, the Commissioner was required to consider the combined effect of Hornbrook's exertional and nonexertional limitations in determining whether he was capable of engaging in substantial gainful activity. *Burnam v. Schweiker*, 682 F.2d 456, 458 (3d Cir. 1982)("The fact that work exists in the national economy for a person who *only* has Burnam's exertional impairments, or for a person who *only* has his nonexertional impairments, does not mean that work exists in the national economy for a person who suffers from *both* types of impairments simultaneously.")(emphasis in original). The limiting effects of Hornbrook's mental impairments can only be understood in relation to his physical impairments. Since the Commissioner will need to reconsider his findings concerning Hornbrook's physical limitations, he will also need to reconsider the extent to which Hornbrook's ability to engage in substantial gainful activity is eroded by the existence of mental limitations. In so doing, of course, the Commissioner must consider the records from Stairways that were apparently overlooked (by either Hornbrook or the Commissioner) during the course of the previous administrative proceedings.

### F. Conclusion

For the foregoing reasons, the ALJ's decision denying Hornbrook's applications for DIB and SSI benefits is not "supported by substantial evidence" within the meaning of § 405(g). Accordingly, it is respectfully recommended that the Defendant's Motion for Summary Judgment (*Document No. 11*) be denied, and that the Plaintiff's Motion for Summary Judgment (*Document No. 9*) be denied to the extent that it requests an award of benefits but granted to the extent that it seeks a vacatur of the administrative decision of the Commissioner of Social Security, and a

remand for further administrative proceedings. It is further recommended that the decision of the Commissioner of Social Security be vacated, and that the case be remanded to him for further administrative proceedings consistent with this report and recommendation.

      In accordance with 28 U.S.C. § 636(b)(1), the parties may file written objections to this report and recommendation within fourteen (14) days of the date on which they are served with copies of it.

/s/ Susan Paradise Baxter<br>
Susan Paradise Baxter<br>
United States Magistrate Judge

cc:    All counsel of record

        U.S. District Judge Sean J. McLaughlin